**COLUMBIA BROADCASTING SYSTEM, INC., Plaintiff-Appellant,**

v.

**AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS, et al., Defendants-Appellees.**

**No. 120, Docket 75–7600.**

United States Court of Appeals, Second Circuit.

Argued Nov. 20, 1979.

Decided April 3, 1980.

Alan J. Hruska, New York City (Roger H. Cummings, John N. Mayberry, Cravath, Swaine & Moore, and John D. Appel, Deputy Gen. Counsel, CBS Inc., New York City, on the brief), for plaintiff-appellant.

Jay H. Topkis, New York City (Bernard Korman, Herman Finkelstein, Allan Blumstein, Max Gitter, Richard Reimer, Fred Heather, Andrew Peck and Paul, Weiss, Rifkind, Wharton & Garrison, New York City, on the brief), for defendant-appellee ASCAP.

Robert J. Sisk, New York City (George A. Davidson, Norman C. Kleinberg, Conley E. Brian, Jr., Michael E. Salzman, and Hughes, Hubbard & Reed, New York City, on the brief), for defendant-appellee BMI, Inc.

David R. Hyde, New York City (Cahill, Gordon & Reindel, New York City, on the brief), for NBC, Inc. as amicus curiae.

Ira M. Millstein, New York City (Weil, Gotshal & Manges, New York City, on the brief), for All Industry Television Station Music License Committee as amicus curiae.

Robert H. Bork, New Haven, Conn., for Aaron Copland, et al., as amici curiae.

Robert M. Lichtman, Washington, D.C. (Philip Elman, Jerry D. Anker, and Wald, Harkrader & Ross, Washington, D.C., Denis DeFreitas, Legal Advisor, The Performing Right Society, Ltd., London, England, and Jean-Loup Tournier, Directeur Gen., Societe des Auteurs, Compositeurs et Editeurs de Musique, Paris, France, on the brief), for The Performing Right Society, Ltd. and

Societe des Auteurs, Compositeurs et Editeurs de Musique as amici curiae.

Barry Grossman, Washington, D.C. (John H. Shenefield, Asst. Atty. Gen., John J. Powers, III, Andrea Limmer, Washington, D.C., on the brief), for The United States as amicus curiae.

Hawkins, Delafield & Wood, New York City (Philip R. Forlenza and Rafael Pastor, New York City), submitted a brief for ABC, Inc., as amicus curiae.

Before LUMBARD, MOORE and NEWMAN, Circuit Judges.

NEWMAN, Circuit Judge:

This is the fourth round of litigation in a lawsuit brought by Columbia Broadcasting System, Inc. (CBS) against the American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music, Inc. (BMI), and their members and affiliates. The lawsuit seeks injunctive relief to prevent ASCAP and BMI from using a blanket license to convey to television networks non-dramatic performing rights, that is, the right to "perform" copyrighted music by transmitting it to the networks' television audiences. The blanket license permits the licensee to use any music in the repertory of the licensor, as often as desired, for a one-time license fee. The license lasts for a stated term, usually but not necessarily one year. Payment is set at either a flat sum or a percentage of the network's revenue. Alternatively to barring use of the blanket license, the CBS suit seeks modification to require that ASCAP and BMI charge predetermined amounts for each time copyrighted music is used on the air. The blanket license in its present form is alleged to be an agreement unreasonably restraining trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

The lawsuit was filed in 1969. Round one was an eight-week bench trial in 1973 in the District Court for the Southern District of New York (Morris Lasker, Judge). In a comprehensive opinion, replete with detailed findings, Judge Lasker found that CBS had failed to prove its allegations and ordered the complaint dismissed.[1] *Columbia Broadcasting System, Inc. v. American Society of Composers*, 400 F.Supp. 737 (S.D. N.Y.1975). Round two was the prior appeal to this Court. In an opinion by Judge Gurfein, the Court ruled that the blanket license was an illegal price-fixing device, a *per se* violation of § 1. The matter was remanded to the District Court for formulation of an appropriate remedy. *Columbia Broadcasting System, Inc. v. American Society of Composers, Authors and Publishers*, 562 F.2d 130 (2d Cir. 1977). Judge Moore disagreed with the conclusion that the blanket license was price-fixing, but concurred in the decision to remand so that a "practical method" of "per use licensing" might be developed. *Id.* at 141. Round three occurred when the Supreme Court reviewed the decision of this Court. Writing for an eight-member majority, Justice White concluded that the blanket license was not a *per se* violation of § 1 and remanded the case to this Court for further proceedings, including an assessment of the blanket license under the rule of reason. *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). Justice Stevens dissented, agreeing with the majority that the blanket license was not a *per se* violation of § 1 but concluding that the record and certain of Judge Lasker's findings established a § 1 violation under the rule of reason. *Id.* at 25, 99 S.Ct. at 1565.

The matter is now before a panel of this Court that includes only Judge Moore from the prior panel.[2] Additional briefs have

---

1. That dismissal left pending a severed counterclaim of the defendants, alleging antitrust violations on the part of CBS. The dismissal of the complaint, disposing of less than all the claims, would ordinarily not result in an appealable final judgment in the absence of a certification pursuant to Fed.R.Civ.P. 54(b); however, the dismissal is appealable under 28 U.S.C.

§ 1292(a)(1) because it is an order denying an injunction.

2. Judge Lumbard was assigned to the panel after the death of Judge Anderson; Judge Newman was assigned to the panel after the death of Judge Gurfein.

been submitted in response to the Court's framing of specific issues, 607 F.2d 543, and extensive oral argument was heard.[3] We now affirm the decision of the District Court.

## Facts

The three prior opinions, especially Judge Lasker's, have so fully set forth the facts that only the bare essentials need be again recounted. ASCAP has a membership of approximately 6,000 music publishing companies and 16,000 composers. BMI, a non-profit corporation, is affiliated with approximately 6,000 music publishing companies and 20,000 composers. Composers of virtually all music copyrighted in the United States have granted to either ASCAP or BMI the non-exclusive right to license users to perform their compositions. The repertory of ASCAP has more than three million compositions, and the repertory of BMI has more than one million compositions. CBS and the other two major television networks, NBC and ABC, have held blanket licenses from both ASCAP and BMI for many years. CBS first obtained its blanket license from ASCAP in 1946. At that time ASCAP held exclusive rights to the music of its members, and the blanket license it offered to broadcasters was the only device whereby they could obtain performing rights to copyrighted music.

As a matter of legal entitlement, licensing arrangements were significantly changed in 1950 when a consent decree, first entered in 1941 to settle Government litigation against ASCAP,[4] was reopened and substantially modified.[5] The amended consent decree permits ASCAP to obtain only non-exclusive rights from its member-composers and enjoins ASCAP from limiting, restricting, or interfering with the right of any member to issue directly to any user a non-exclusive license for performing rights. The composers thus retain the legal right to bypass ASCAP and license performing rights directly to CBS. The amended decree also requires ASCAP to offer to any broadcaster either the blanket license, or, as an alternative, a per program license. Both types of licenses permit the user to perform any music in the ASCAP repertory; for the per program license the user pays only with respect to programs on which copyrighted music is performed, whereas, with the blanket license, the user pays a one-time fee for the duration of the license. The decree also provides that in the event of disputes concerning the amount of license fees, the District Court for the Southern District of New York is authorized to determine a reasonable fee.

Similar, though not identical provisions govern the licensing of performing rights by BMI. For purposes of this litigation, the significant fact, stipulated to by the parties, is that CBS could obtain non-exclusive licenses for performing rights directly from copyright owners affiliated with BMI with the same ease or difficulty as it could obtain such rights from copyright owners who are members of ASCAP.

As a matter of factual occurrence, CBS has never made any attempt to obtain performing rights directly from a copyright owner.

Beyond these facts concerning licensing arrangements and opportunities, some understanding is required of the facts concerning CBS's use of music. Two types of classification are involved: one concerns the function of the music, and the second concerns the circumstances under which the selection of music is made. CBS, like all broadcasters, uses music as theme, background, or feature. Theme music is played at the start or conclusion of a program and serves to enhance the identification of the program. Background music accompanies some of the action on the screen. Feature music is a principal focus of audience attention, such as a popular song sung on a variety show.

---

3. The oral argument was held before Judge Newman was assigned to the panel, but he has had the benefit of a complete 234-page transcript of that argument.

4. *United States v. ASCAP*, 1940–1943 Trade Cas. ¶ 56,104 (S.D.N.Y.1941).

5. *United States v. ASCAP*, 1950–1951 Trade Cas. ¶ 62,595 (S.D.N.Y.1950).

Music on network television is selected in one of three ways. Most of it, as much as 90%, is selected by production companies, or "packagers," which produce television programs and sell them to the networks. The music on these programs is almost always theme and background music, much of it composed specially for the production company. Typically the company employs a composer to write theme and background music, acquires the copyright from him, and assigns it to its own music publishing subsidiary. Such music is called "inside" music. In some instances the packager decides to use music that has already been composed, so-called "outside" music. In these instances the packager must acquire from the copyright owner the right to record the music on the soundtrack of the program's film or tape. This right is known as a "synch" right, the music often being carefully fitted to synchronize with the action on the screen. Acquisition of the synch right, however, does not carry with it the separate right to perform the music on the air. That performing right could be acquired by the packager when he acquires the synch right, and reassigned to the network; however, the industry practice has been that the network automatically acquires the performing right for all music used on packaged programs under the network's blanket license for the performing rights to all ASCAP music, and the packager therefore has no need to acquire a performing right for reassignment to the network.

A small portion of network music is selected by the network itself, in those few instances when the network is producing its own programs. A still smaller portion is selected by the person or group performing the music, in those very few instances where music is spontaneously used. Examples are a football half-time show or a late night talk show on which a guest sings an unscheduled song.

Discussion

■ Our starting point for determining whether the blanket license violates § 1 is the decision of the Supreme Court remanding the case to us. That decision obliges us to make "an assessment under the rule of reason of the blanket license as employed in the television industry." 441 U.S. at 24–25, 99 S.Ct. at 1565. Since the parties are agreed that the relevant market is the licensing of performing rights to the television networks, we assume our consideration should be similarly confined to the blanket license as employed by the television networks.[6] A rule of reason analysis requires a determination of whether an agreement is on balance an unreasonable restraint of trade, that is, whether its anti-competitive effects outweigh its pro-competitive effects. *National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Chicago Board of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918). In this case, however, we are met with the threshold contention of the defendants that the balancing of pro- and anti-competitive effects need not be undertaken because Judge Lasker's findings of fact demonstrate that the blanket license has no anticompetitive effect at all.

Before examining that contention, we must consider whether it is open to us under the Supreme Court's remand. It is possible to read the penultimate paragraph of Justice White's opinion—the one directing us to make a rule of reason assessment—as if the Supreme Court had concluded that the blanket license is a restraint of trade and was requesting further consideration only as to whether its restraining effect was unreasonable, *i. e.*, not outweighed by pro-competitive advantages. Our reading of the entire opinion, however, persuades us that no such initial conclusion was reached. In the first place, the safer

---

6. The distinction may have significance, since the lawfulness of the blanket license has also been challenged by non-network broadcasters.

course is to read judicial opinions as deciding only what they purport to decide. That may not always be only the narrow holding, for courts, especially appellate courts, have an entirely legitimate function of elucidating principles of law, fairly raised by litigation, even if the resulting pronouncements are not absolutely required for the precise decision reached. Appellate guidance is not valueless because it is dictum. But appellate courts, endeavoring to rule beyond the precise holding of a case, normally make that intention unmistakably clear. In this instance, the Supreme Court's opinion purports to decide only whether the blanket license is a *per se* violation of § 1, that is, a practice with such a high likelihood of having unjustifiable anti-competitive effects that it is condemned under the antitrust laws without the need to assess its effect in a particular case. See *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Once the Supreme Court decided that the blanket license is not a *per se* violation of § 1, we believe it made no decision concerning the effect of the license in the network television industry at issue in this case, thereby leaving open the question of whether the license has any anti-competitive effect at all. Secondly, Justice White's opinion contains a specific observation that strongly supports our view of the decision's reach. The opinion declares that the majority is "uncertain whether the practice on its face has the effect . . . of restraining competition among the individual composers." 441 U.S. at 13, 99 S.Ct. at 1559. That observation leaves for consideration whether the practice could have a restraining effect as applied to the particular circumstances prevailing in the industry. To that possibility we now turn, but in doing so, we examine the record and Judge Lasker's findings to see whether the blanket license, on its face and as applied, is a restraint at all.

There can be no dispute with the observation of Justice Stevens, in his dissenting opinion, that "there is no price competition between separate musical compositions." 441 U.S. at 32, 99 S.Ct. at 1568–69. The blanket license is the only device by which performing rights are licensed to the networks, and, under a blanket license, no selector of music to be performed on a network considers what the price of using one song would be compared to the price of using any other song. No price considerations affect the choice among songs because the network holds a blanket license to perform all songs.

The absence of price competition among songs, however, does not mean that the blanket license is a restraint upon any potential competition. For price competition to exist there must be at least one buyer interested in purchasing a product from two or more sellers. In this case, there is no evidence that CBS has ever attempted to purchase performing rights to any song from the copyright owners, either the composers or the music publishing companies to which they may have assigned their copyrights. If the opportunity to purchase performing rights to individual songs is fully available, then it is customer preference for the blanket license, and not the license itself, that causes the lack of price competition among songs. Of course, even customer preference cannot save some practices from illegality under the antitrust law. If competing sellers fix the prices of their products, they violate § 1 no matter how much a buyer may prefer accepting their fixed price to negotiating with each for a lower price. But a practice that is not a *per se* violation, and this blanket license has authoritatively been found not to be such, does not restrain trade when the complaining customer elects to use it in preference to realistically available marketing alternatives.

Trade is restrained, frequently in an unreasonable manner, when rights to use individual copyrights or patents may be obtained only by payment for a pool of such rights, *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948) (copyrighted motion pictures); *Alden-Rochelle, Inc. v. ASCAP*, 80 F.Supp. 888 (S.D.N.Y.1948) (copyrighted

music); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) (patents), but the opportunity to acquire a pool of rights does not restrain trade if an alternative opportunity to acquire individual rights is fully available. *Automatic Radio Manufacturing Co. v. Hazeltine Research, Inc.*, 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950) (patents); *Standard Oil Co. v. United States*, 283 U.S. 163, 51 S.Ct. 429, 75 L.Ed. 999 (1931) (same).

CBS challenges this approach on the ground that some alternatives can always be imagined that would satisfy the market needs of an antitrust plaintiff. As CBS argues, the blanket license cannot possibly be saved from illegality under § 1 simply because CBS has the alternative of hiring composers to fill its needs for music. CBS is right. An antitrust plaintiff is not obliged to pursue any imaginable alternative, regardless of cost or efficiency, before it can complain that a practice has restrained competition. But in this case the defendants do not suggest that CBS should do anything more extraordinary than offer to buy from competing sellers. We agree with the defendants that if that opportunity is fully available, and if copyright owners retain unimpaired independence to set competitive prices for individual licenses to a licensee willing to deal with them, the blanket license is not a restraint of trade.

In fact, if there is a realistic opportunity to obtain performance rights from individual copyright holders, then the remedy CBS seeks in this case—modification of the blanket license into an option to use all songs plus a charge for each use of any one song—would be a clear instance of unjustified price-fixing in violation of § 1. If ASCAP were to make a per use charge for each song, it would have to determine a price to be charged. Whether or not that price varied for each song,[7] the determination of any price for use of a song by a membership organization of competing songwriters would be classic price-fixing. See 441 U.S. at 17 n. 27, 99 S.Ct. at 1561 n. 27. If licensing directly from individual copyright owners were not feasible, then it would be arguable that per use pricing by ASCAP might be that rare instance when price-fixing does not necessarily violate § 1. But CBS's proposed remedy cannot possibly avoid the strictures of § 1 if direct licensing is feasible. We therefore turn to an examination of the feasibility of direct licensing.

It could be argued that the best evidence against the feasibility of direct licensing is the fact that CBS has brought this lawsuit at great expense to avoid taking the blanket license. That surely suggests that the blanket license is not something for which CBS has a preference. But that argument ignores the principle that "the purpose of the Sherman Act is to protect competition, not competitors." *Checker Motors Corp. v. Chrysler Corp.*, 283 F.Supp. 876, 885 (S.D.N.Y.1968) (Mansfield, J.), *aff'd*, 405 F.2d 319 (2d Cir.), *cert. denied*, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969). If the market for selling performing rights to the television networks would be competitive among copyright owners whenever any network chose to deal with them, the antitrust laws are satisfied even though one network has reasons of its own for forgoing that competitive market in preference to the blanket license. The defendants suggest that CBS's preference for the blanket license derives from its unwillingness to seek competitive prices from individual copyright owners while its network competitors enjoy the advantages of obtaining their performing rights under their blanket licenses. In defendants' view, CBS is bringing this lawsuit, not because competition among songwriters has been restrained, but because CBS wants protection from the prospect of its competitors' continuing with blanket li-

---

7. Not the least of the ironies of the CBS claim is that the per use charge it finds acceptable is simply the formula now used by ASCAP to distribute royalties among its members. That formula, based on type of music and frequency of use, does not value any song differently than any other. Thus, if ASCAP were to base charges to CBS on the ASCAP royalty formula, CBS would obtain no price competition whatsoever. Neither CBS nor the packagers would be able to shop competitively for cheaper songs when selecting music.

censes. We need not determine whether defendants' speculation is correct, but we agree that the issue is whether competition among copyright owners is realistically feasible, regardless of whether CBS may have some business reason of its own for preferring not to enter an available competitive market.

The entire trial in the District Court concerned primarily the issue of whether direct licensing was feasible. Judge Lasker placed the burden of proof upon CBS, as the plaintiff, to prove that it was not, for he concluded that there was no restraint of trade if direct licensing was feasible. After carefully analyzing the evidence CBS offered, Judge Lasker concluded that "CBS has failed to prove the factual predicate of its claims—the non-availability of alternatives to the blanket license . . . ." 400 F.Supp. at 780–81. That ultimate finding is abundantly supported by subsidiary findings and by the record, which completely refute all of CBS's allegations of barriers to direct licensing.

CBS maintained that the existing market structure created by the blanket license effectively prevented it from seeking direct licensing because any money spent to acquire performance rights from individual copyright owners would be wasted once CBS had already paid ASCAP and BMI for performance rights to all music. However, nothing prevented CBS from attempting to obtain from the copyright owners performance rights for some interval following expiration of the term of the blanket license.[8]

CBS also contended that there existed no machinery to handle the numerous transactions that would be required to obtain performance rights directly. The record establishes that such machinery is entirely feasible; indeed a single agency now serves as the broker for the thousands of transactions in which copyright owners sell television synch rights and motion picture performance rights. Nevertheless, the claim is pressed that it would take some amount of

time and money to establish a similar mechanism for the individual brokering of network television performance rights. We note that Justice Stevens relied on this circumstance to conclude that "real and significant," albeit not "insurmountable" barriers to direct licensing existed. 441 U.S. at 35, 99 S.Ct. at 1570. With deference, we conclude that the evidence and Judge Lasker's analysis of it demonstrate that neither the time nor the expense of creating machinery for direct licensing establishes a barrier of which CBS can complain. It must be recalled that CBS has obtained its performance rights by blanket licenses ever since the late 1940's. Having transacted business in that fashion for that length of time, CBS cannot expect the antitrust laws to assure it that a changeover to direct licensing can be accomplished instantly or at no expense. Moreover, Judge Lasker found that the changeover could be begun very rapidly with CBS meeting its music needs as the machinery for direct licensing was put into place. When Justice Stevens refers to the machinery being created within a year, 441 U.S. at 35, 99 S.Ct. at 1570, he is citing the outer limit testified to by a CBS witness, 400 F.Supp. at 764, whereas Judge Lasker found that "the relatively modest machinery required could be developed during a reasonable planning period." *Id.* at 765. And when Justice Stevens refers to an expenditure of millions of dollars by CBS, he does not mean the cost of creating direct licensing machinery, but only the payment CBS will make during the final term of its blanket license. But that is an expense for which it bargained and for which it has received considerable value.

Next, CBS argued that individual copyright owners would be reluctant to deal directly with CBS in the licensing of performance rights. At trial this was the so-called "disinclination" issue. Wholly apart from the record, we have some difficulty even contemplating the feared situation of individual songwriters displaying reluctance

---

**8.** We were advised at oral argument that at the present time CBS holds no license from ASCAP and has held none since March 1978.

to arrange to have their songs performed on a national television network, especially one owned by "the giant of the world in the use of music rights." *Id.* at 771. But we need not rely on an intuitive rejection of this CBS claim. Judge Lasker found, after hearing substantial evidence from composers and music publishers, that if CBS were to seek direct licensing, "copyright proprietors would wait at CBS' door." *Id.* at 779.

Finally, CBS alleged a barrier to direct licensing based upon what was called the music-in-the-can problem. CBS apprehended that, without a blanket license, it would be subject to demands for unconscionably high fees from the owners of copyrighted music already recorded on the soundtracks of taped programs and feature films in CBS's inventory. Judge Lasker properly rejected this claim both on the facts and the law. As a matter of fact, he found, based on the testimony, that "hold-ups" were not realistically to be feared, that synch rights were regularly obtained at fair prices after the recording had been accomplished, that copyright proprietors would not wish to incur CBS's disfavor by attempting a "holdup," and that the whole claim was undercut by the turnover in the CBS inventory. *Id.* at 775–78. Apart from the lack of factual support for the argument, Judge Lasker also correctly rejected it on the ground that it is not a consequence of the blanket license. If CBS would be vulnerable to a "hold-up" when it tries to acquire performance rights for music on a feature film it wishes to rerun, that is a consequence of CBS's failure to acquire rerun performance rights at the time it acquired the film. At that time CBS accepted the risk that it would one day have to purchase performance rights for reruns, either as part of the purchase price for a blanket license or at a separate price for a license obtained directly from the copyright owner.[9]

Pervading these assessments of each of the CBS contentions of alleged barriers to direct licensing is one indisputable fact that perhaps overshadows all others. If CBS were to forgo the blanket license, seek direct licenses, and then discover, contrary to the facts found by Judge Lasker, that a competitive market among copyright owners was not a feasible alternative to the blanket license, it would be entitled, under the consent decree, to assure itself of continued performing rights by immediately obtaining a renewed blanket license. Indeed, Paragraph IX of the ASCAP decree permits CBS to use any music covered by a license application, without payment of fee, subject to whatever fees are subsequently negotiated or determined to be reasonable by the court if negotiations fail. *Id.* at 743 n. 3. In short, the District Court has found that CBS can feasibly obtain individual licenses from competing copyright owners and that it incurs no risk in endeavoring to do so. There is no basis in the record for concluding that these findings by the District Court are clearly erroneous.

Of course, the fact that CBS has failed to prove that the blanket license restrains competition among copyright owners does not guarantee that such competition will occur if CBS or the other networks elect to forgo their blanket licenses in the future. Uncertainty is created not only by the normal risks of predicting the future but also by the special circumstances currently governing the selection of music for network television programs. As previously mentioned, approximately 90% of this music is selected by the program packagers. If CBS forgoes its blanket license, we cannot predict—indeed, the record gives us no adequate basis for making a prediction—as to how performance rights for this 90% will be purchased. Perhaps CBS will inform the

9. CBS also contends that the blanket license impairs its ability to add films to its inventory. Asserting a disadvantage vis-a-vis its network competitors, CBS alleges that, lacking performance rights, it would be precluded from bidding on films available to networks holding blanket licenses. Apart from the fact that this argument concerns competition among networks, not among copyright owners, it fails to reckon with the possibility that CBS can negotiate an individual license for the performance rights to music on a film, with the license to become effective only upon CBS's acquisition of the film.

packagers that it will buy programs only when performance rights have been acquired by the production company. That would create an incentive for the packagers to consider price of performance rights for individual songs in selecting music, especially outside theme or feature music. But the packagers might decline to buy performance rights, preferring to sell their programs to other networks that continue to hold blanket licenses. To the extent that happened, CBS, if it wanted a program for which performance rights had not been purchased, would have to purchase the rights for music already selected and recorded, in which event no meaningful price competition among copyright owners would occur. Or it may happen that packagers will be so anxious to sell their programs to CBS that they will acquire performance rights, even though that might not be their initial preference.

Another situation for which prediction is hazardous concerns the CBS-produced programs that use music spontaneously selected by the performers. The blanket license, among its other virtues, assures CBS of the right to air such programs, regardless of what music the performers elect to play. Without a blanket license, CBS would have to purchase performance rights after the program was aired, or negotiate with ASCAP for some modified form of program license to secure the right to perform any music in the ASCAP repertory only on designated programs where music is spontaneously selected, or forgo the telecasting of such programs.

We mention these alternatives (and there are surely others) not to express any judgment upon them, but simply to point out the difficulty of determining what the market for performance rights will look like if CBS elects to forgo the blanket license. Neither the District Court nor we can predict that perfect competition will ensue. But what the District Court has found, and what we affirm, is that CBS has failed to prove that the existence of the blanket license has restrained competition. Since the blanket license is not a *per se* unlawful arrangement, its restraining effect must be

proved before § 1 liability can be found. When, after a full trial, such proof is lacking, the challenge to the blanket license is properly dismissed.

Affirmed.