**MATSUSHITA ELECTRICAL INDUSTRIAL CO., LTD.,**
Plaintiff,

v.

**CINRAM INTERNATIONAL, INC., Defendant.**

**No. CIV.01–882–SLR.**

United States District Court,
D. Delaware.

Jan. 5, 2004.

Steven T. Margolin, Steven J. Balick, John G. Day, Ashby & Geddes, Wilmington, DE, Jeffrey L. Kessler, David L. Yohai, Adam C. Hemlock, John P. Mastando III, Kara R. Paldino, Weil, Gotshal & Manges LLP, New York City, Matthew D. Powers, Christopher J. Cox, Jeffrey G. Homrig, Joshua W. Andrews, Weil, Gotshal & Manges LLP, Redwood Shores, CA, Counsel for Plaintiff/Counterclaim Defendant.

Jack B. Blumenfeld, Donald F. Parsons Jr., Mary B. Graham, Karen Jacobs Louden, Philip Bangle, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, M. Howard Morse, David A.J. Goldfine, Drinker, Biddle & Reath LLP, Washington, D.C.; Paul H. Saint–Antoine, Amy B. Miner, Drinker Biddle & Reath LLP, Philadelphia, PA, Counsel for Defendant/Counterclaim Plaintiff.

## MEMORANDUM OPINION

SUE L. ROBINSON, Chief Judge.

## I. INTRODUCTION

Matsushita Electric Industrial Co., Ltd. ("MEI") filed an action against Cinram International, Inc. ("Cinram") on December 20, 2001 for patent infringement of five patents related to optical discs, including digital versatile discs ("DVDs"). (D.I. 1) Cinram agreed to license three of the five asserted patents on February 28, 2002, thereby removing infringement issues with respect to these patents. (D.I. 21) MEI, consequently, dismissed without prejudice its infringement claims for these patents. MEI later withdrew a fourth patent from its suit against Cinram, and the parties stipulated to dismiss that patent in August 2002. (D.I. 44) At the same time, MEI amended its complaint to assert infringement of an additional patent. (Id.) Thus, the patent infringement suit involves U.S. Patent Nos. 5,681,634 and 5,972,250.

Cinram filed four antitrust counterclaims against MEI on March 13, 2002. (D.I. 12) Cinram specifically charges that MEI has conspired to restrain trade by participating in the non-exclusive DVD 6C Licensing Agency (the "6C Pool") in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. (Id. at ¶ 87) Cinram also alleges that MEI and other members of the 6C Pool have conspired, attempted, and committed the offense of monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. (Id. at ¶¶ 94, 101, 107) Cinram alleges that it has experienced harm to its business and properties and been forced to pay excessive patent royalties as a result of MEI's illegal actions. (Id. at ¶¶ 82, 88, 95, 102, 108) It also alleges that it is unable to license and exercise patents related to DVD technology on competitive terms. (Id. at ¶ 82) To redress these injuries, "Cinram seeks to have MEI license 6C Pool members and independent licensees, through the 6C Pool and individually, on non-discriminatory terms, so that pool members and independent licensees pay the same royalties (while each pool member receives a share of pool royalties collected based on its patent contribution). In short, Cinram ... [seeks] to level the unlevel playing field."[1] (D.I. 253)

MEI is a Japanese corporation with its principal place of business in Kadoma-shi,

---

1. In its countercomplaint, Cinram requests a declaration that MEI violated Sections 1 and 2 of the Sherman Act, threefold damages, costs, attorney fees, and injunctive relief. (See D.I. 12) Cinram requests the following: (1) that MEI withdraw from any licensing or cross-licensing agreements with 6C Pool members for DVD technology, particularly involving "essential" technology, that offer terms to members more favorable than those given to Cinram; (2) that MEI discontinue entering into licensing or cross-licensing agreements for DVD technology, particularly involving the "essential" technology, that of-

Osaka-fu, Japan. (D.I. 1 at ¶ 7) Cinram is a Canadian corporation with its principal place of business in Toronto, Ontario, Canada and DVD production facilities in Canada, Europe, and the United States. (D.I. 8 at ¶ 44) The court has original federal question jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a). The court also has exclusive jurisdiction over this action under Section 4 of the Sherman Act, 15 U.S.C. § 4.

On May 6, 2002, MEI filed a motion to (1) bifurcate the patent and antitrust claims; and (2) phase discovery on the antitrust counterclaims. (D.I. 20) The court granted MEI's motion on August 27, 2002. (D.I. 49) The court limited discovery to the single threshold issue of whether Cinram was able to obtain individual DVD patent licenses from each member of the 6C Pool such that the 6C Pool does not restrain trade or engage in anti-competitive conduct as a matter of law. (D.I. 49)

Presently before the court is MEI's motion for summary judgment as to the threshold issue. (D.I. 156) For the reasons discussed below, the court grants MEI's motion.

## II. BACKGROUND

### 1. The Technology

DVDs are high-capacity media that permit the storage and readout of information in a digital format. (D.I. 8 at ¶ 43) DVDs are used for the storage and reproduction of video images in a format called DVD–Video. DVDs are also used for the storage and reading of digital information for use with computers in a format called DVD–ROM.

### 2. The 6C Pool

The DVD Forum is an international association of companies that are engaged in the research, development, manufacture, and/or sales related to DVD technology. (D.I. 8 at ¶ 57) The DVD Forum was founded in 1995 by MEI under the name "DVD Consortium." (Id.) Around 1995, the DVD Forum agreed on specifications for the recording, production, replication, and use of both DVDs and DVD equipment (the "DVD Standard Specification"). (Id.)

After establishing the DVD Standard Specification, six members of the DVD Forum, namely MEI, Hitachi, Mitsubishi, Toshiba, JVC, and AOL–Time Warner, organized the "6C Pool" and entered an agreement to manage the intellectual property rights around their DVD patented technology (the "6C Pool Formation Agreement").[2] (D.I. 8 at ¶ 62) Under the terms of the 6C Pool Formation Agreement, each member of the 6C Pool contributed one or more of its patents related to DVD technology to the pool to form a collection of patents "essential" to DVD production.[3] (Id.) Each pool member acquired a cross-license to the other members' "essential" patents in exchange for its contribution. (D.I. 8 at ¶ 72) The members agreed as part of formation to offer a non-exclusive, non-transferable license to

---

fer terms more favorable than those given to Cinram; and (3) that MEI offer a license to its DVD technology on fair, reasonable, and non-discriminatory terms. (Id.)

2. IBM has since joined the 6C Pool. (D.I. 169 at 7)

3. "Essential" patents are defined in the 6C Pool License to mean "[1] necessarily infring-

ed when implementing the DVD Standard Specifications or [2] claiming technologies for which there is no realistic alternative in implementing the DVD Standard Specifications." (D.I. 157 at tab 1, ex. 3, § 1.4) In other words, these patents are understood to have no substitutes, to be complementary to each other, and to be necessary to comply with the DVD Standard Specifications.

these pooled patents to non-member companies interested in replicating DVDs in compliance with the DVD Standard Specification ("independent replicator"). (D.I. 169 at 7) To this end, the members drafted a standard license agreement to facilitate licensing the pooled patents (the "6C Pool License"). (*See* D.I. 157, tab 1) Section 2.1 of the 6C Pool License specifically recites:

> Licensor hereby grants to Licensee and its Affiliates a non-exclusive, non-transferrable license to make, have made, use, sell, and otherwise dispose of DVD Products under the DVD Patents or any of their claims pursuant to the Conditions of Exhibit 3.

(D.I. 157 at tab 1, § 2.1)

Also as part of formation, each member consented to offer individual licenses to its "essential" DVD patents on a non-exclusive basis to interested third party licensees as an alternative to the 6C Pool License. (D.I. 157 at 16) The members incorporated this option into the 6C Pool License to notify potential licensees of a separate means of acquiring licenses for "essential" patents. Section 2.3 of the 6C Pool License specifically recites:

> Instead of dealing with Licensor to obtain licenses for DVD Patents of the members of the Group, Licensee shall have the option to negotiate and take a license under any DVD Patents and other related patents owned by each member of the Group pursuant to separate negotiations with each of the members on fair, reasonable, and non-discriminatory terms, whether or not Licensee intends to manufacture and/or sell DVD Products in conformity with the DVD Standard Specifications.

(D.I. 157 at tab 2, § 2.3) In view of Sections 2.1 and 2.3 of the 6C Pool License, an independent replicator who wishes to make DVDs without infringing any DVD patent, therefore, has the option of approaching either the 6C Pool for a 6C Pool License or each member of the 6C Pool for individual licenses.

The 6C Pool initially charged independent replicators $0.075 per disc under the 6C Pool License. (*Id.*) The members later lowered the price to $0.065 or $0.05 per disc, depending upon when the independent replicator negotiated its 6C Pool License. (*Id.*) MEI serves as the licensing agent to the Americas on behalf of the 6C Pool. (D.I. 8 at ¶ 62)

In addition to owning patents relating to DVD technology, MEI, JVC, AOL–Time Warner, and Mitsubishi commercially replicate DVDs. (*Id.*) These four pool members, consequently, are in competition with independent replicators who must take either a 6C Pool License or individual licenses to avoid patent infringement. (D.I. 169 at 8) Indeed, MEI is a direct competitor of Cinram in the market for wholesale production of DVDs in the DVD–Video and DVD–ROM formats. Moreover, MEI may practice DVD technology in compliance with the DVD Standard Specification without owing the same per disc license fees that Cinram must pay as a 6C Pool licensee; MEI only pays a $0.0015 per disc royalty whereas Cinram must pay a $0.05 per disc royalty. (D.I. 169 at 9)

### 3. Business Review Letter from the United States Department of Justice

In October 1998, the 6C Pool requested a Business Review Letter from the United States Department of Justice ("DOJ") pursuant to the DOJ's Business Review Procedure, 28 C.F.R. § 50.6. (D.I. 21, ex. B) The 6C Pool specifically asked for a statement of the DOJ's antitrust enforcement intentions with respect to the 6C Pool's plan to assemble and offer a package license to "essential" patents, to manufacture products in compliance with the

DVD–ROM and DVD–Video formation, and to distribute royalty income to members of the 6C Pool. (*Id.*) The 6C Pool represented that "the pool will make the essential DVD patents available to licensees on fair, reasonable and non-discriminatory terms for the manufacture of products conforming to the [DVD Standard] Specifications." (D.I. 136 at 8) It also represented that the terms would entitle "any licensee to the benefit of favorable royalty terms offered to any other licensee." (*Id.*) Furthermore, the 6C Pool represented that they would "make their DVD patents available individually, outside the [6C] [P]ool, on fair, reasonable, and non-discriminatory terms." (*Id.*) Finally, the 6C Pool represented that "royalties will be a sufficiently small element of the final cost of DVD products so as to preclude them from serving as a device to coordinate downstream product prices." (*Id.*)

Based on these assurances, the DOJ issued a Business Review Letter on June 10, 1999 indicating that it would not initiate an enforcement action. (D.I. 21, ex. B) The DOJ found that the 6C Pool was "likely to combine complementary patent rights, thereby lowering the costs of manufacturers that need access to them in order to produce discs, players and decoders in conformity with the DVD–Video and DVD–ROM formats." (*Id.*) The DOJ concluded that the 6C Pool was not likely to violate antitrust laws. (*Id.*)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted).

If the moving party has demonstrated an absence of material fact, then the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed. R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, then the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, the court must grant summary judgment if the party responding to the motion fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Omnipoint Comm. Enters., L.P. v. Newtown Township*, 219

F.3d 240, 242 (3d Cir.2000) (quoting *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548).

## IV. DISCUSSION

Under Section 1 of the Sherman Act, "[e]very contract, combination ... conspiracy, in restraint of trade or commerce ... is hereby declared to be illegal." 15 U.S.C. § 1 (2003). Section 2 of the Sherman Act also makes it illegal for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce." 15 U.S.C. § 2 (2003). The Supreme Court has advised that "[t]he Sherman Act has always been discriminatingly applied in the light of economic realities." *Broadcast Music, Inc. v. Columbia Broad. Sys. Inc.*, 441 U.S. 1, 14, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). In addition, the Supreme Court has stated that "[t]here are situations in which competitors have been permitted to form joint selling agencies or other pooled activities, subject to strict limitations under the antitrust laws to guarantee against abuse of the collective power thus created." *Id.*

In determining whether a pooled activity violates antitrust laws, courts must consider whether to employ a per se or a rule of reason analysis. The per se approach treats certain practices as being so plainly anti-competitive and without redeeming virtue as to be per se unreasonable. William C. Holmes, Intellectual Property and Antitrust Law § 5.01 (2003). The rule of reason approach, in contrast, broadly examines the business practices and related market factors to determine whether the questioned practice imposes an unreasonable restraint on competition. *Id.* The Supreme Court has recognized that patent pools should be addressed under the rule of reason analysis, except for arrangements where the only apparent purpose is naked price fixing. *United States v. Line Material*, 333 U.S. 287, 315, 68 S.Ct. 550, 92 L.Ed. 701 (1948). In this context, the rule of reason analysis predominantly focuses on identifying pro-competitive benefits and balancing them against potential anti-competitive effects. Herbert Hovenkamp et al., An Analysis of Antitrust Principles Applied to Intellectual Property Law § 34.4a (2003).

Patent pooling arrangements may serve valid competitive objectives, especially in situations involving "blocking" and "complementary" patents. "For example, where patents 'block' one another in the sense that neither can be used without infringing the other, pooling becomes necessary to remove the stalemate and facilitate exploitation of the patents." Holmes, *supra*, § 14.01. Similarly, if multiple patents complement each other to protect related but separate parts of a larger product or process, then pooling may be needed to produce a complete item. *Id.* Pooling likewise may be justified as the best way of solving a patent interference or infringement dispute. *Id.*

On the other hand, courts have recognized that certain types of pooling arrangements may significantly hurt competition. This is especially true when patents protect substitute goods that compete against each other in the marketplace. Hovenkamp, *supra*, § 34.2c. In these situations, patent pools should be scrutinized for naked price-fixing, output restraints, exclusionary practices, and foreclosure of competition in downstream or related markets. *Id.* at § 34.4a2.

 "Trade is restrained, sometimes unreasonably, when the rights to use individual copyrights or patents may be obtained only by payment for a pool of such rights, but that the opportunity to acquire a pool of rights does not restrain trade if an alternative opportunity to acquire individual rights is realistically available."

*Buffalo Broad. Co. Inc. v. American Soc'y of Composers, Authors & Publishers*, 744 F.2d 917, 925 (2d Cir.1984). However, "[a]n antitrust plaintiff is not obliged to pursue any imaginable alternative, regardless of cost or efficiency, before it can complain that a practice has restrained competition." *Id.* (citing *Columbia Broad. Sys. Inc. v. American Soc'y of Composers, Authors and Publishers*, 620 F.2d 930, 936 (2d Cir.1980)). The true issue in situations involving a pool of rights is whether the antitrust plaintiff lacked a "realistic opportunity" as a "practical matter" to obtain individual licenses from individual owners as opposed to a single license from the pool. *Id.* If the antitrust plaintiff has the opportunity to license independently, then the pool of rights does not restrain trade in violation of Section 1 of the Sherman Act. It likewise does not violate Section 2 of the Sherman Act because Section 2 requires proof of an anti-competitive act to acquire or maintain a monopoly. *See Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

MEI argues that the 6C Pool members each contractually agreed when they formed the 6C Pool to offer individual licenses for their "essential" patents to interested parties on fair, reasonable, and non-discriminatory terms as an alternative to the 6C Pool License. MEI points out that both the 6C Pool Formation Agreement and the actual 6C Pool License contain provisions reciting this obligation. In light of its contractual duties, MEI asserts that it is willing to grant an individual license to any company interested in its individual "essential" patents.

MEI maintains that it repeatedly notified prospective licensees of the availability of individual licenses. Specifically, MEI contends that it sent a letter, press release, application form for a 6C Pool License, and brochure of "essential" patents to Cinram as early as July 1999. (*See* D.I. 157, tab 5) It also contends that it sent additional letters to Cinram on January 19, 2001, April 23, 2001, and April 30, 2001. (*See* D.I. 162, tab 6; tab 7; tab 8) MEI further avers that Mr. Lewis Ritchie, Chief Financial Officer, Executive Vice President of Finance and Administration, and Corporate Secretary of Cinram, attended a 6C Pool presentation on July 13, 2000 and was informed of the availability of individual licenses. (*See* D.I. 157, tab 4 at 64–68; D.I. 162, tab 4) Thereafter on July 14, 2002, MEI claims that it even provided Mr. Ritchie with a copy of the standard 6C Pool License which explains that individual licenses are available as an alternative to the 6C Pool License. (D.I. 157, tab 4 at 75–76) MEI argues that Cinram did not respond to any of these notifications, nor did it seek to negotiate an individual license or ask for individual licensing rates, even though it met with 6C Pool representatives on seven occasions from August 2000 to February 2002. (*See* D.I. 162, ¶ 11; D.I. 157, tab 4 at 37, 75) Moreover, MEI points out that Cinram did not approach other 6C Pool members to inquire about individual licenses. (*See* D.I. 156, tab 9 at 391–92) On this basis, MEI asserts that Cinram cannot meet its burden to establish that individual licenses are not a realistic alternative.

To counter MEI's argument, Cinram asserts that MEI's contractual obligation to offer individual licenses is illusory because, in reality, it does not offer such licenses on fair, reasonable, and non-discriminatory terms. To this end, Cinram maintains that the structure of the 6C Pool discourages individual licenses because such licenses would undercut the pool price. (*See* D.I. 159, tab 1 at ¶ 17) As well, Cinram charges that as its direct competitor in the DVD manufacturing area, MEI is less inclined to offer low individual licens-

ing fees because it does not want to help the competition. (*See id.*)

Cinram also argues that the terms for individual licenses are cost-prohibitive. Cinram explains that the cost for individual licenses from four of the six 6C Pool members totaled $0.11.[4] Cinram points out that this total substantially exceeds the $0.05 per disc royalty that it currently pays for a 6C Pool License, thereby making individual licenses entirely impractical. Cinram substantiates its argument by noting that DOCdata Quanta, Metatec, Asustek Computer Inc., Wistron Corp., CMC Magnetics Corp., Cyberlink, Richoh, and Nippon Columbia all explored the possibility of individual licenses with 6C Pool members, but abandoned efforts in favor of a 6C Pool License.[5] Cinram further validates its position by noting that MEI told Mr. Ritchie on two separate occasions that individual licenses would be "more costly" than a 6C Pool License and not a realistic alternative. (*See* D.I. 171, tab 6 at 36–37)

Finally, Cinram maintains that MEI and other 6C Pool members purposefully delayed in responding to inquiries regarding individual licenses. Cinram points out that Metatac contacted MEI and the other 6C Pool members for individual licensing terms in August 1999, but only received feedback from JVC and Hitachi after several months of delay. Particularly, JVC waited until June 2000 to respond, but did not quote any terms. JVC then took an additional ten months until April 2001 to provide a rate quote. Hitachi delayed fourteen months to provide its quotation to Metatec. With regard to MEI, Metatec renewed its request several times in 2001 and finally received a term sheet from MEI two and one-half years after its initial request. Similarly, Cinram notes that DOCdata approached MEI and the other 6C Pool members regarding individual licenses in early November 2000. Hitachi provided a response on December 12, 2000; JVC provided a response on December 25, 2000; Mitsubishi provided a response on December 1, 2000, and Toshiba provided a response on March 16, 2001. Despite three written reminders, MEI did not acknowledge this inquiry until March 2001. At that time, MEI apologized for the delay and requested additional time to respond. MEI finally responded to DOCdata's request after a total lag of one year, but did not quote the price for an individual license to its essential patents. Likewise, AOL–Time Warner deferred responding for six months and then informed DOCdata that it had not yet formulated a specific policy for granting individual licenses, but that any individual offer would necessarily be at a rate greater than its share of the 6C Pool royalties.

█ Viewing the evidence of record and all reasonable inferences to be drawn therefrom in a light most favorable to Cinram as the non-moving party, the court finds that there are no genuine issues of material fact regarding whether individual licenses are a realistic alternative to the 6C Pool License. While this court previously recognized in *Broadcast Music, Inc., v. Moor Law, Inc.*, 484 F.Supp. 357, 367 (D.Del.1980) (citations omitted) that a plaintiff is not required to attempt individual licensing negotiations before suing under antitrust law when it is clear that such gesture would be futile, the court con-

---

4. MEI ultimately offered an individual license for $0.03 per disc; Toshiba offered an individual license for $0.04 per disc; Hitachi offered an individual license for $0.015 per disc; and JVC offered an individual license for $0.025 per disc per layer on a disc.

5. MEI's claims that it has negotiated an individual license with Thomson already and that other companies have declared their intention to pursue individual licenses.

cludes that Cinram realistically could avail itself of individual licenses to "essential" DVD patents. Cinram was presented with a plethora of information regarding individual licensing terms from MEI through letters, brochures, and a direct presentation; it simply chose to pursue a 6C Pool License instead. Additionally, the court concludes that MEI did not seek to entirely avoid discussions with independent replicators about individual licensing terms. Rather, the court finds that MEI showed a willingness to discuss such terms based upon its two conversations with Mr. Ritchie. While MEI's slowness could be construed as purposeful delay as suggested by Cinram, the court understands that communications often proceed very slowly and deliberately in the business world, particularly when such communications occur on a global scale as in the instant case.

■ Moreover, despite the fact that numerous independent replicators approached MEI for individual licenses but eventually settled on a 6C Pool License, the court is not persuaded that MEI merely gave lip service to the option of individual licenses. The 6C Pool License is the simplest way to acquire a license to all the "essential" DVD patents. It likewise is the most economical approach, given that (1) the cost of a 6C Pool License is less than the cost of obtaining multiple individual licenses and (2) the per disc royalty under the 6C Pool License is $0.05 whereas the per disc royalty under individual licenses exceeds $0.11. The Second Circuit has stated that the only valid test to prove that an alternative is **too costly** to be a realistic alternative is whether the price for such a license, in an objective

sense, is higher than the value of the intellectual property rights being conveyed. *Buffalo Broad.*, 744 F.2d at 926. In accord with this reasoning, the court concludes that the per disc royalty differential only causes the individual licensing option to be an unrealistic alternative if it is higher than the value of the DVD rights conveyed. The court finds that the facts at bar do not show this to be the case.

Furthermore, the court does not overlook the fact that the DOJ issued a Business Review Letter concluding that the 6C Pool was not likely to violate antitrust laws. The court appreciates the DOJ's familiarity and experience analyzing complex pooling arrangements and is strongly persuaded by the DOJ's conclusions. In light of these considerations, the court finds that there is enough evidence of record to enable a jury to reasonably decide that individual licenses present a realistic alternative to the 6C Pool License and that the 6C Pool, in turn, does not violate antitrust laws. Accordingly, the court concludes that summary judgment is appropriate and grants MEI's motion as to Cinram's antitrust claims.[6]

## V. CONCLUSION

For the reasons stated, MEI's motion for summary judgment as to Cinram's antitrust claims (D.I. 156) is granted. An order shall issue.

**6.** The court further notes that, in the procedural context of this case, if the patents in suit are deemed "essential," then Cinram is licensed to practice the patented technology and there is no apparent antitrust injury. Conversely, if the patents in suit are deemed

to be not "essential" and not covered by the 6C Pool License, likewise there is no apparent antitrust injury. Under these circumstances, the court is hard pressed to divine why a complicated antitrust case should be permitted to move forward.