744 F.2d 917
 53 USLW 2170, 223 U.S.P.Q. 478, 1984-2
Trade Cases 66,204,
1984 Copr.L.Dec. P 25,710
 BUFFALO BROADCASTING COMPANY, INC., Kid Broadcasting
Corporation, KWTX Broadcasting Company, Inc., Metromedia,
Inc., and Storer Broadcasting Company, on behalf of
themselves and All Persons or Entities Who Own Local
Television Stations Which Obtain Music License Agreements
With American Society of Composers, Authors and Publishers
and/or Broadcast Music, Inc., Plaintiffs- Appellees,
v.
AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS,
Stanley Adams, as President of American Society of
Composers, Authors and Publishers, Cy Coleman, Hal David,
Famous Music Corp., MCA, Inc., Morton Gould, Shapiro,
Bernstein & Co., Inc., on behalf of themselves and all other
members of American Society of Composers, Authors and
Publishers, Broadcast Music, Inc., Al Gallico Music Corp.,
Paul Anka, Jerry Bock, Sheldon Harnick, Hollis Music, Inc.
and Unart Music Corp., on behalf of themselves and all other
affiliates of Broadcast Music, Inc., Defendants-Appellants.
 Nos. 7, 235, 236, Dockets 83-7058, 83-7060, 83-7062.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 1, 1983.
Finally Submitted Jan. 18, 1984.
Decided Sept. 18, 1984.
 
 Jay Topkis, New York City (Allan Blumstein, Andrew J. Peck, Fred D. Heather, Gerard E. Harper, Richard H. Reimer, Paul, Weiss, Rifkind, Wharton & Garrison, and Bernard Korman, Gen. Counsel, ASCAP, New York City, on the brief), for defendants-appellants American Soc. of Composers, Authors and Publishers, et al.
 Robert J. Sisk, New York City (Norman C. Kleinberg, Edward W. Chapin, Michael E. Salzman, Naomi F. Sheiner, Jacqueline D. Gilbert, William H. Voth, Hughes, Hubbard & Reed, New York City, on the brief), for defendant-appellant Broadcast Music, Inc.
 Barry H. Garfinkel, New York City (William Hughes Mulligan, Timothy A. Nelsen, Richard M. Schwartz, Skadden, Arps, Slate, Meagher & Flom, New York City, on the brief), for defendants-appellants Al Gallico Music Corp., Sheldon Harnick, Hollis Music, Inc., Unart Music Corp., and the class of affiliates of Broadcast Music, Inc.
 Ira M. Millstein, New York City (James W. Quinn, R. Bruce Rich, Jay N. Fastow, Kenneth L. Steinthal, Lois Peel Eisenstein, David B. Stern, Weil, Gotshal & Manges, New York City, on the brief), for plaintiffs-appellees.
 Frederick F. Greenman, Jr., Alvin Deutsch, Edward Klagsbrun, Bernard G. Schneider, Linden & Deutsch, New York City, submitted a brief for amicus curiae American Guild of Authors and Composers/The Songwriters Guild.
 Stephen A. Kroft, Sondra E. Berchin, Karen Magid, Rosenfeld, Meyer & Susman, Beverly Hills, Cal., submitted a brief for amicus curiae Motion Picture and Television Producers and Syndicators.
 Robert M. Lichtman, Daniel L. Koffsky, Wald, Harkrader & Ross, Philip Elman, Washington, D.C., Michael J. Freegard, Chief Exec. Officer, Performing Right Soc. Ltd., London, England, Jean-Loup Tournier, Le Directeur Gen., Societe des Auteurs, Compositeurs et Editeurs de Musique, Paris, France, submitted a brief for amici curiae The Performing Right Soc. Ltd. and Societe des Auteurs, Compositeurs et Editeurs de Musique.
 Irwin Karp, Port Chester, N.Y., submitted a brief for amicus curiae Authors League of America, Inc.
 Frank H. Easterbrook, Chicago, Ill., submitted a brief for amici curiae Chappell & Co., et al.
 Marvin E. Frankel, Stuart J. Baskin, Kramer, Levin, Nessen, Kamin & Frankel, New York City, submitted a brief for amici curiae Aaron Copland, et al.
 John H. Midlen, Jr., Washington, D.C., submitted a brief for amicus curiae Old-Time Gospel Hour.
 Before NEWMAN, WINTER and PRATT,* Circuit Judges.
 JON O. NEWMAN, Circuit Judge:
 
 
 1
 Once again we consider the lawfulness under section 1 of the Sherman Antitrust Act of the blanket license offered by the American Society of Composers, Authors and Publishers (ASCAP) and Broadcast Music, Inc. (BMI). The license permits the licensee to perform publicly any musical composition in the repertory of the licensor. In this litigation the blanket license is challenged by a class of licensees comprising all owners of "local" television stations in the United States, i.e., stations not owned by any of the three major television networks, ABC, CBS, and NBC. After a bench trial in the District Court for the Southern District of New York (Lee P. Gagliardi, Judge), the blanket license was held to be an unreasonable restraint of trade. Buffalo Broadcasting Co. v. ASCAP, 546 F.Supp. 274 (S.D.N.Y.1982). ASCAP and BMI were enjoined from licensing to local television stations non-dramatic music performing rights for any "syndicated" program. For reasons that follow, we conclude that the evidence was insufficient as a matter of law to show that the blanket license is an unlawful restraint of trade in the legal and factual context in which it currently exists. We therefore reverse the judgment of the District Court.
 
 Background
 I. The Parties
 
 2
 The five named plaintiffs own and operate one or more local television stations. They represent a class of all owners of local television stations in the United States who obtain music performing rights pursuant to license agreements with ASCAP and/or BMI. The class does not include the three major television networks, ABC, CBS, and NBC, each of which owns five television stations. The class includes approximately 450 owners who, because of multiple holdings, own approximately 750 local television stations. Only one owner has opted out of the class. The class includes some relatively small corporations that own a single station with relatively modest revenue and some major corporations with significant television revenue and profits, such as Metromedia, Inc., which owns seven stations including those in the major markets of New York City (WNEW-TV) and Los Angeles (WTTV). Since 1949 most stations have been represented in negotiations with ASCAP and BMI by the All-Industry Television Station Music License Committee ("the All-Industry Committee").
 
 
 3
 Defendant ASCAP is an unincorporated membership association of composers, authors, and publishers of music, formed in 1914. It has approximately 21,000 writer and 8,000 publisher members. It holds non-exclusive licenses for the non-dramatic performing rights to more than three million musical compositions. BMI is a non-profit corporation organized in 1939 by radio broadcasters. It has approximately 38,000 writer and 22,000 publisher affiliates. Its repertory, for which it holds non-exclusive licenses for non-dramatic performing rights, includes more than one million compositions. The eleven individual defendants represent two classes of defendants that include all persons from whom ASCAP and BMI have obtained the non-exclusive right to license non-dramatic music performing rights to others.
 
 II. Music, Rights, and Licenses
 
 4
 The subject matter of this litigation is music transmitted by television stations to their viewer-listeners. Television music is classified as either theme, background, or feature. Theme music is played at the start or conclusion of a program and serves to enhance the identification of the program. Background music accompanies portions of the program to heighten interest, underscore the mood, change the pace, or otherwise contribute to the overall effect of the program. Feature music is a principal focus of audience attention, such as a popular song sung on a variety show.
 
 
 5
 More particularly, we are concerned with the licensing of non-dramatic performing rights to copyrighted music, that is, the right to "perform" the music publicly by transmitting it, whether live or on film or tape, to television audiences.[1] This performance right is created by the Copyright Act as one of the exclusive rights enjoyed by the copyright owner. 17 U.S.C. Sec. 106(4) (1982). Also pertinent to this litigation is the so-called synchronization right, or "synch" right, that is, the right to reproduce the music onto the soundtrack of a film or a videotape in synchronization with the action. The "synch" right is a form of the reproduction right also created by statute as one of the exclusive rights enjoyed by the copyright owner. Id. Sec. 106(1). The Act specifically accords the copyright owner the right to authorize others to use the various rights recognized by the Act, including the performing right and the reproduction right, id. Sec. 106, and to convey these rights separately, id. Sec. 201(d)(2). The Act recognizes that conveyance of the various rights protected by copyright may be accomplished by either an exclusive or a non-exclusive license. Id. Sec. 101.
 
 
 6
 Music performed by local television stations is selected in one of three ways. It may be selected by the station itself, or by the producer of a program that is sold to the station, or by a performer spontaneously. The stations select music for the relatively small portion of the program day devoted to locally produced programs. The vast majority of music aired by television stations is selected by the producers of programs supplied to the stations. In some instances these producers are the major television networks, but this litigation is not concerned with performing rights to music on programs supplied to the local stations by the major networks because the networks have blanket licenses from ASCAP and BMI and convey performing rights to local stations when they supply network programs. Apart from network-produced programs, the producers of programs for local stations are "syndicators" supplying the stations with "syndicated" programs. Most syndicated programs are feature length movies or one-hour or half-hour films or videotapes produced especially for television viewing by motion picture studios, their television production affiliates, or independent television program producers. However, the definition of "syndicated program" that was stipulated to by the parties also includes live, non-network television programs offered for sale or license to local stations.[2] These syndicated programs are the central focus of this litigation. The third category of selected music, songs chosen spontaneously by a performer, accounts for a very small percentage of the music aired by the stations. These spontaneous selections of music can occur on programs produced either locally or by the networks or by syndicators.
 
 
 7
 Syndicators wishing to include music in their programs may either select pre-existing music (sometimes called "outside" music) or hire a composer to compose original music (sometimes called "inside" music). Most music on syndicated programs, up to 90% by plaintiffs' estimate, is inside music commissioned through the use of composer-for-hire agreements between the producer and either the composer alone or the composer and a corporation entitled to contract for a loan of the composer's services. Composer-for-hire agreements are normally standard form contracts. The salary paid to the composer, sometimes called "up front money," varies considerably from a few hundred dollars to several thousand dollars. The producer for whom a "work made for hire" was composed is considered by the Act to be the author and, unless the producer and composer have otherwise agreed, owns "all of the rights comprised in the copyright." Id. Sec. 201(b). However, composer-for-hire agreements for syndicated television programs typically provide that the producer assigns to the composer and to a music publishing company the performing right to the music composed pursuant to the agreement.[3]
 
 
 8
 When the producer wishes to use outside music in a film or videotape program, it must obtain from the copyright proprietor the "synch" right in order to record the music on the soundtrack of the film or tape. "Synch" rights vary in price, usually within a range of $150 to $500. When the producer wishes to use inside music, as is normally the case, it need not obtain the "synch" right because it already owns this right by virtue of the "work made for hire" provision of the Act.
 
 
 9
 Whether the producer decides to use outside or inside music, it need not acquire the television performing right since neither the making of the program nor the selling of the program to a television station is a "performance" of the music that would require a performing right. The producer is therefore free either to sell the program without the performing right and leave it to the station to obtain that right, or to obtain the performing right from the copyright proprietor, usually the composer and a publishing company, and convey that music performing right to the station along with the performing rights to all other copyrighted components of the program. If the producer obtains the music performing right from the copyright proprietor and conveys it to the station, the transaction is known as "source licensing" or "clearance at the source." If the station obtains the music performing right directly from the copyright proprietor, the transaction is known as "direct licensing."
 
 
 10
 The typical arrangement whereby local television stations acquire music performing rights in syndicated and all other programs is neither source licensing nor direct licensing. Instead, the stations obtain from ASCAP and BMI a blanket license permitting television performance of all of the music in the repertories of these organizations. The license is conveyed for a fee normally set as a percentage of the station's revenue. That fee, after deduction of administrative expenses, is distributed to the copyright proprietors on a basis that roughly reflects the extent of use of the music and the size of the audience for which the station "performed" the music. The royalty distribution is normally divided equally between the composer and the music publishing company.
 
 
 11
 In addition to offering stations a blanket license, ASCAP and BMI also offer a modified form of the blanket license known as a "program" or "per program" license. The program license conveys to the station the music performing rights to all of the music in the ASCAP or BMI repertory for use on the particular program for which the license is issued. The fee for a program license is a percent of the revenue derived by the station from the particular program, i.e., the advertising dollars paid to sponsor the program.
 
 
 12
 The blanket license contains a "carve-out" provision exempting from the base on which the license fee is computed the revenue derived by the station from any program presented by motion picture or transcription for which music performing rights have been licensed at the source by the licensor, i.e., ASCAP or BMI. The program license contains a more generous version of this provision, extending the exemption to music performing rights licensed at the source either by ASCAP/BMI or by the composer and publisher. Thus, for film and videotaped syndicated programs, a station can either obtain a blanket license for all of its music performing rights and reduce its fee for those programs licensed at the source by ASCAP/BMI, or obtain program licenses for each of its programs that use copyrighted music and avoid the fee for those programs licensed at the source by either ASCAP/BMI or by the composers and publishers.
 
 III. Prior Litigation
 
 13
 The merits of the current lawsuit cannot properly be assessed without consideration of the extensive history of litigation concerning the licensing of music performing rights. In 1941 an antitrust suit brought by the United States against ASCAP and BMI was settled by entry of consent decrees,[4] imposing some limitations on the operations of ASCAP and BMI. Those decrees, however, permitted ASCAP and BMI to obtain exclusive licenses for music performing rights from their members and affiliates. The exclusive nature of these licenses prevented those requiring performing rights from negotiating directly with composers for rights to individual compositions. That limitation precipitated suit by operators of movie theaters, who successfully challenged the blanket license they were obliged to take from ASCAP in order to exhibit films with music from the ASCAP repertory. Alden-Rochelle, Inc. v. ASCAP, 80 F.Supp. 888 (S.D.N.Y.1948). See also M. Witmark & Sons v. Jensen, 80 F.Supp. 843 (D.Minn.1948), appeal dismissed, 177 F.2d 515 (8th Cir.1949).
 
 
 14
 The restraining nature of the ASCAP blanket license, as applied to movie theater operators, prompted the Government to reopen the 1941 ASCAP consent decree and secure in 1950 a significant amendment.[5] The amended decree, known as the "Amended Final Judgment," prohibits ASCAP from acquiring exclusive music performing rights, limiting it solely to non-exclusive rights. ASCAP is also prohibited from limiting, restricting, or interfering with the right of any member to issue to any user a non-exclusive license for music performing rights.
 
 
 15
 The Amended Final Judgment requires ASCAP to grant a blanket license to anyone requesting it. The decree also requires ASCAP to offer to any television or radio broadcaster a program license. ASCAP is also required "to use its best efforts to avoid any discrimination among the respective fees fixed for the various types of licenses which would deprive the licensees or prospective licensees of a genuine choice from among such various types of licenses." Amended Final Judgment, p VIII, 546 F.Supp. at 278 n. 6. Finally, in the event license applicants believe they are being overcharged, the decree permits any applicant for a blanket or program license to apply to the District Court for the determination of a "reasonable" fee, and in such a proceeding, "the burden of proof shall be on ASCAP to establish the reasonableness of the fee requested by it." Id. p IX(A), 546 F.Supp. at 278-79 n. 6.
 
 
 16
 In 1951 local television stations instituted suit pursuant to the Amended Final Judgment to determine reasonable license fees and terms. United States v. ASCAP (Application of Voice of Alabama, Inc.), Civ. No. 13-95 (S.D.N.Y.1951). In 1954 the parties reached agreement to set the per program license rate at 9% of the revenue of programs using ASCAP music and to reduce the blanket license rate to 2.05% of total station revenue, less certain deductions. In light of this agreement the Voice of Alabama proceeding was discontinued.
 
 
 17
 In 1961 local television stations requested from ASCAP a modified blanket license that excluded syndicated programs. When ASCAP refused, the stations sued in the consent decree court to require ASCAP to issue such a license. The District Court declined to require such a license, United States v. ASCAP (Application of Shenandoah Valley Broadcasting, Inc.), 208 F.Supp. 896 (S.D.N.Y.1962), aff'd, 331 F.2d 117 (2d Cir.), cert. denied, 377 U.S. 997, 84 S.Ct. 1917, 12 L.Ed.2d 1048 (1964). In affirming, this Court observed that if the blanket license was serving to restrain trade unreasonably in violation of the antitrust laws, the stations' remedy was to urge the Department of Justice to seek modification of the consent decree or to initiate a private suit. 331 F.2d at 124.
 
 
 18
 Rather than press an antitrust challenge, the stations initiated another round of fee determination pursuant to the consent decree. That litigation, known as the Shenandoah proceeding, was settled upon the parties' agreement that the form of blanket and program licenses then in use "may be entered into lawfully by each party to this proceeding" and that the rate for the blanket license was reduced to 2% of 1964-65 revenue plus 1% of incremental revenue above that base. United States v. ASCAP (Application of Shenandoah Valley Broadcasting, Inc.), Civ. No. 13-95 (S.D.N.Y. July 28, 1969) (final order). The All-Industry Committee reported to the stations that this rate reduction would save them approximately $53 million through 1977, an estimate that was exceeded because of the rapid growth of station revenue.
 
 
 19
 Thereafter, while the local television stations took blanket licenses from ASCAP and BMI, the legality of the license was challenged by a network licensee, CBS. Its suit, filed in 1969, was dismissed by Judge Lasker after an eight-week trial. CBS, Inc. v. ASCAP, 400 F.Supp. 737 (S.D.N.Y.1975). Judge Lasker ruled that the evidence failed to show that the blanket license restrained CBS from obtaining music performing rights to individual compositions if it chose to seek and pay for them. On appeal, this Court reversed, ruling that the blanket license was an unlawful price-fixing device, a per se violation of section 1. CBS, Inc. v. ASCAP, 562 F.2d 130 (2d Cir.1977). That decision was reversed by the Supreme Court, which ruled that the blanket license was not a per se violation of section 1. BMI, Inc. v. CBS, Inc., 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). Upon remand from the Supreme Court, we affirmed Judge Lasker's decision, agreeing that the blanket license had not been proven to be a restraint of trade. CBS, Inc. v. ASCAP, 620 F.2d 930 (2d Cir.1980) ("CBS-remand"), cert. denied, 450 U.S. 970, 101 S.Ct. 1491, 67 L.Ed.2d 621 (1981).
 
 
 20
 Perhaps encouraged by our 1977 ruling in favor of CBS, the local stations began this litigation in 1978. A four-week bench trial occurred in 1981 before Judge Gagliardi, resulting in the decision now on appeal. That decision holds that the blanket licensing of music performing rights to local television stations unreasonably restrains trade in violation of section 1 and enjoins ASCAP and BMI from granting to local television stations music performing rights in any syndicated programs. With respect to syndicated programs, the injunction thus bars ASCAP and BMI from offering either blanket or program licenses and also prohibits them from conveying performing rights with respect to such programs on any basis at all.
 
 Discussion
 A. Estoppel
 
 21
 As a threshold issue, ASCAP contends that the local stations are estopped from challenging the lawfulness of the blanket license as applied to them by reason of the position they took in settlement of the Shenandoah rate determination proceeding. Specifically, ASCAP relies on the fact that the stations settling that litigation represented to the District Court that the ASCAP blanket license "may be entered into lawfully" and that ASCAP in effect bargained for that representation by giving up at least $53 million in license fees. There is undeniable force to the contention that those who secured benefits exchanged in part for a representation to the District Court that the blanket license is lawful ought not to be heard to assert the contrary. See Chance v. Board of Examiners, 561 F.2d 1079, 1092 (2d Cir.1977). But the argument is not necessarily a winning one for three reasons: It was not asserted in the trial court, it rests on a consent decree that applied to a term of years ending in 1977, and its force in the antitrust context is not free from doubt. Cf. Bernstein v. Universal Pictures, Inc., 517 F.2d 976, 981-82 (2d Cir.1975) (plaintiff who has previously asserted contrary legal position still deserving of antitrust relief).
 
 
 22
 We are persuaded to move past the estoppel argument, without determining its validity, and consider the merits of the lawsuit. In the first place, the argument is a matter of considerable dispute, and, if not forfeited by failure to raise it in the trial court, the argument comes to us on a record that inadequately develops the facts as to whom the estoppel binds and whom it benefits. Second, even if the estoppel argument bars the claims of those local television stations for whom the All-Industry Committee spoke when negotiating the Shenandoah settlement, it is not at all clear that it would bar the claims of the approximately 200 stations that have come into existence since the 1969 settlement. Finally, there is uncertainty whether the estoppel would inure to the benefit of ASCAP's co-defendant, BMI, which was not a party to the Shenandoah proceeding. Without resolving our doubts on these points, we proceed to consider the merits of the dispute.
 
 
 23
 B. Is There a Restraint?
 
 
 24
 We think the initial and, as it turns out, dispositive issue on the merits is whether the blanket licensing of performing rights to the local television stations has been proven to be a restraint of trade. See CBS-remand, supra, 620 F.2d at 934-35. Arguably the answer is a fortiori after the Supreme Court's decision and our decision on remand in the CBS litigation. The Supreme Court noted that "the necessity for and advantages of a blanket license for [television and radio networks] may be far less obvious than is the case when the potential users are individual television or radio stations ...." 441 U.S. at 21, 99 S.Ct. at 1563. And on remand we upheld the blanket license against the claim of a network. However, for several reasons, it does not follow that the local stations lose simply because the CBS network lost. First, the Supreme Court's observation concerned the relative pro-competitive effects of the blanket license for a network compared to local stations. Even though the pro-competitive effects may be greater when the licensees are local stations, those pro-competitive effects do not necessarily outweigh the anti-competitive effects. Second, the Supreme Court's comparative statement does not determine the threshold issue of whether the blanket licensing of performing rights to local television stations is a restraint at all. The fact that CBS did not prove that blanket licensing of networks restrained competition does not necessarily mean that blanket licensing of local stations may not be shown to be a restraint. Finally, in CBS-remand we reviewed a District Judge's ruling that no restraint had been proved; here, we review a ruling that the local stations proved the existence of a restraint.
 
 
 25
 In reaching his conclusions as to the existence of a restraint, Judge Gagliardi endeavored to apply the mode of analysis we had used in CBS-remand. We there noted that trade is restrained, sometimes unreasonably, when rights to use individual copyrights or patents may be obtained only by payment for a pool of such rights, but that the opportunity to acquire a pool of rights does not restrain trade if an alternative opportunity to acquire individual rights is realistically available. 620 F.2d at 935-36. We recognized, as CBS had urged, that a plaintiff will not be held to have an alternative "available" simply because some imaginable possibility exists. We agreed that CBS's "alternative" of hiring composers to fill its need for music was not the sort of realistic alternative that prevented the blanket license from being a restraint. "An antitrust plaintiff is not obliged to pursue any imaginable alternative, regardless of cost or efficiency, before it can complain that a practice has restrained competition." Id. at 936. What we examined in CBS-remand, as Judge Lasker had done in the District Court, was whether the plaintiff had proved that it lacked a realistic opportunity to obtain performance rights from individual copyright holders.
 
 
 26
 We continue to believe that this is the appropriate inquiry, especially in light of the Supreme Court's recent decision concerning the NCAA's attempt to regulate the televising of college football games. NCAA v. Board of Regents of the University of Oklahoma, --- U.S. ----, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). Two aspects of that ruling are especially pertinent. First, the Court was there concerned, as we are here, with an agreement whereby a pool of rights was conveyed. In determining that the agreement constituted a restraint, the Court stated, "[S]ince as a practical matter all member institutions need NCAA approval, members have no real choice but to adhere to the NCAA's television controls." Id. at 2963 (emphasis added) (footnote omitted). Thus, the restraining effect of the challenged agreement arose not by virtue of its terms alone, but because as a "practical" matter no "real" alternative existed whereby individual negotiations could occur between member schools and television broadcasters. Second, the Court had occasion to characterize the blanket license for music performing rights that it had sustained against a per se challenge in CBS and stated that under the blanket license "each individual remained free to sell his own music without restraint." Id. at 2968 (emphasis added).[6] NCAA thus reinforces our view that the first issue is whether the local television stations have proven that they lack, as a "practical" matter, a "real" alternative to the blanket license for obtaining music performing rights.
 
 
 27
 In reaching the conclusion that plaintiffs had proven the lack of realistically available alternatives to the blanket license, Judge Gagliardi gave separate consideration to three possibilities: the program license,[7] direct licensing, and source licensing. We consider each in turn.
 
 
 28
 Program License. Judge Gagliardi based his conclusion that a program license is not realistically available to the plaintiffs essentially on two circumstances: the cost of a program license and the reporting requirements that such a license imposes on a licensee. "The court therefore concludes that the per program license is too costly and burdensome to be a realistic alternative to the blanket license." 546 F.Supp. at 289 (footnote omitted). Without rejecting any subsidiary factual finding concerning the availability of a program license, we reject the legal conclusion that it is not a realistic alternative to the blanket license.
 
 
 29
 The only fact found in support of the conclusion that the program license is "too costly" is that the rates for such licenses are seven times higher than the rates for blanket licenses. Id. The program license rate is 9%; the blanket license rate is between 1% and 2%. This difference in rates does not support the District Court's conclusion for several reasons. First, the rates are charged against different bases. The blanket license rate is applied to a station's total revenue; the program license rate is applied only to revenue from a particular program. Since the base for the blanket license fee includes revenue from network programs, for which the networks have already acquired performing rights by virtue of their blanket licenses, as well as some local programs that use no music, it is inevitable that the rate for a local station's blanket license will be less than the rate for a program license taken solely to permit use of music on a particular program.
 
 
 30
 Second, the degree of difference between the two rates is largely attributable to the stations themselves. In negotiating a revision of license rates in the Shenandoah proceeding in 1969, the All-Industry Committee elected not to press for reduction of the program license rate and instead concentrated on securing a reduction of the blanket license rate, believing, as it informed the broadcasters it represented, that "the critical matter at this time was to get the best possible blanket license." Having preferred to win a lower price for only the blanket license, the stations are in no position to point to the widened differential between rates to show that program licenses are not realistically available.
 
 
 31
 Third, the only valid test of whether the program license is "too costly" to be a realistic alternative is whether the price for such a license, in an objective sense, is higher than the value of the rights obtained. But plaintiffs presented no evidence that the price of the program license is "high" in terms of value received.[8] Instead, they rely, as did the District Court, on a comparison between the program license rate and the blanket license rate. That comparison, defendants contend, leads to the anomalous result that the more the blanket license is a bargain, the more it is likely to be a restraint. The anomaly is more apparent than real. Within reasonable price ranges, the program license is not an unrealistic alternative to the blanket license simply because the rate for the latter is less. The differential in rates may reflect the inherent difference in the bundle of rights being conveyed. Even if the blanket license is objectively the "better buy" for most users, the program license would be a realistic alternative so long as it was fairly priced for those who might find it preferable for reasons other than price. But if the program license were available only at a price beyond any objectively reasonable range, the "bargain" nature of the blanket license would not immunize it from characterization as a restraint. Sellers of alternatives may not set absurdly high prices at which they have no real intention of making sales and then point to the cheaper price of the package under attack to argue that it is not a restraint but the object of customer preference.
 
 
 32
 Thus, while the relative cheapness of the blanket rate does not necessarily mean that it is not a restraint, the absence of evidence that the program license has been artificially priced higher than is reasonable for value received bars any conclusion that the program license is "too costly" to be a realistic alternative. The fact that very few stations have elected to take program licenses is not evidence that they are priced beyond an objectively reasonable price range. It may simply reflect, as defendants believe, that the blanket license has virtues of convenience that make it a legitimate object of customer preference.
 
 
 33
 Fourth, even if there were evidence that showed the program license rate to be too "high," that price is always subject to downward revision by Judge Conner, who currently supervises the administration of the Amended Final Judgment. Two aspects of that judgment are especially pertinent to any claim that the price of the program license is too "high." In a proceeding to redetermine rates, the burden is on ASCAP to prove the reasonableness of the rates charged, and the judgment expressly requires ASCAP "to use its best efforts to avoid any discrimination among the respective fees fixed for the various types of licenses which would deprive the licensees or prospective licensees of a genuine choice from among such various types of licenses," Amended Final Judgment, p VIII, 546 F.Supp. at 278 n. 6 (emphasis added). The availability of a judicially enforceable requirement of a "reasonable" fee precludes any claim that the program license rate is too high, especially in the context of television stations regularly represented by a vigorous committee with the demonstrated resources, skill, and willingness to invoke the rate-adjustment process.
 
 
 34
 In addition to cost, Judge Gagliardi considered the program license not realistically available because of the burdens of required record-keeping that accompany its use. This conclusion is similarly flawed by the lack of evidence that the record-keeping requirements have been unnecessarily imposed. Since the program license permits only selective use of copyrighted music, it is inevitable that some reporting requirements would be reasonable to assure proper use. The District Court made no finding that any aspect of the record-keeping is objectively unnecessary, and plaintiffs offered no evidence to this effect. As with price, the apparent benefit of the blanket license in sparing the user record-keeping may simply reflect inherent differences in the two products. In any event, the program license has been shown only to require more record-keeping than the blanket license; it has not been shown to require burdens objectively unreasonable, such as would support a conclusion that the program license is not realistically available. Finally, though we do not decide the point, it would appear that any aspect of the record-keeping requirement that prevents the stations from having a "genuine choice" between the program and the blanket license would be subject to revision under the Amended Final Judgment.
 
 
 35
 The lack of evidence that the program license is not realistically available has a two-fold significance in determining whether the blanket license has been shown to be a restraint. First, the program license itself remains as an alternative to the blanket license for the local stations to acquire performing rights to the music on all of their syndicated programs. That consequence is not necessarily determinative since the program license is in reality a limited form of the blanket license and, like the blanket license, is subject to the objection that its use by stations would continue the present practice whereby no price competition occurs among individual songs with respect to licensing of performing rights. However, the availability of the program license has a second and more significant consequence: The program license provides local stations with a fall-back position in the event that they forgo the blanket license and then encounter difficulty in obtaining performing rights to music on some syndicated programs either by direct licensing or by source licensing. Whether those alternatives were proven to be unavailable as realistic alternatives is our next inquiry.
 
 
 36
 Direct Licensing. The District Court concluded that direct licensing is not a realistic alternative to the blanket license without any evidence that any local station ever offered any composer a sum of money in exchange for the performing rights to his music. That evidentiary gap exists despite the 21-year interval between entry of the Amended Final Judgment and the trial of this case, during which the local stations had ample opportunity to determine whether performing rights could be directly licensed.
 
 
 37
 The District Court declined to attach any significance to the absence of purchase offers from stations directly to copyright proprietors for two related reasons. Judge Gagliardi concluded, first, that direct licensing could not occur without the intervention of some agency to broker the numerous transactions that would be involved and, second, that the television stations lack the market power to induce anyone to come forward and perform that brokering function. 546 F.Supp. at 290. We have no quarrel with the first proposition. Some intermediary would seem essential to negotiate performing rights licenses between thousands of copyright proprietors and hundreds of local stations, in the same manner that the Harry Fox Agency for years has brokered licenses for "synch" rights between copyright proprietors and program producers.
 
 
 38
 However, we see no evidentiary support for the District Court's second proposition--that no one would undertake the brokering function for direct licensing of performing rights. Judge Gagliardi was led to this conclusion, not on the basis of any evidence of an expressed reluctance on anyone's part to broker direct licensing, but because of his view of the difference between the market power of CBS and that of the local television stations. In CBS Judge Lasker had found, 400 F.Supp. at 779, and we had emphasized, 620 F.2d at 938, that if CBS were to seek direct licensing, "copyright proprietors would wait at CBS' door." In this case, Judge Gagliardi found that "local television stations acting individually and severally would possess no such awesome power over copyright owners." 546 F.Supp. at 290. From this finding he concluded, "Since no lines would form at the doors of local television stations, no centralized machinery would arise to facilitate direct licensing." Id.
 
 
 39
 This reasoning escalates a characterization of the evidence in CBS into a minimum requirement for future cases. The plaintiffs in this case do not discharge their burden of proving that local stations cannot realistically obtain direct licenses by showing that they have less market power than CBS, " 'the giant of the world in the use of music rights,' " CBS v. ASCAP, supra, 400 F.Supp. at 771 (quoting testimony of a former CBS vice-president). The issue is whether the local stations have been shown to lack power sufficient to give them a realistic opportunity to secure direct licenses. To conclude that they do not simply because no one of them is as powerful as CBS disregards the functioning of a market. Sellers are induced to sell by a perception of aggregate demand, existing or capable of stimulation. The automobile manufacturers who recently decided to bring back the convertible car did not await a fleet order from the nation's largest user of automobiles; they responded to the actual and anticipated consumer preferences of individual car buyers, whose individual market power is surely no greater than that of the least successful television station. Thus, it avails plaintiffs nothing to cite the testimony of Salvatore Chiantia, president of the National Music Publishers Association, that as a publisher he would not line up at the door of KID-TV in Idaho Falls to license performing rights. Brief for Appellees at 52. What is pertinent is Chiantia's point that while it would be difficult for him to have a staff that would wait at the doors of 700 television stations, "if [direct licensing] was the way I was going to get my music performed, I would have to devise a system which would make it possible for me to license." The plaintiffs have not presented evidence to show that a brokering mechanism would not handle direct licensing transactions if the stations offered to pay royalties directly to copyright proprietors.
 
 
 40
 The alleged infeasibility of direct licensing is further undermined by the acknowledged ability of the stations to secure direct licensing of music needed for their locally produced programming. Judge Gagliardi observed, "Since local television stations deal directly with the composers or copyright owners of the music contained in locally-produced programs, stations would not encounter difficulties in finding and obtaining music licenses from those composers and copyright owners." 546 F.Supp. at 289 n. 37. Nevertheless, he concluded that, because local stations would be paying double for such direct licenses so long as they held a blanket license, "direct licensing would not be a realistically available alternative unless the blanket license were discarded entirely." Id. at 289-90 n. 37. But if the stations can realistically obtain direct licenses for local programming by offering reasonable amounts of money,[9] they can avoid double payment by forgoing the blanket license. Their response is that they dare not do so because they will then be unable to secure performing rights to music on syndicated programs, which constitute the bulk of their program day. But, as we have previously noted, the availability of the program license enables them to forgo the blanket license and still obtain music rights for any program for which direct licensing proves infeasible. Alternatively, they can pursue source licensing, to which we now turn.
 
 
 41
 Source Licensing. As Judge Gagliardi noted, the "current availability and comparative efficiency of source licensing have been the focus of this lawsuit." Id. at 291. The availability of source licensing is significant to the inquiry as to whether the blanket license is a restraint because so much of the stations' programming consists of syndicated programs for which the producer could, if so inclined, convey music performing rights. Most of these syndicated programs use composer-for-hire music. As to such music, the producer starts out with the rights of the copyright, including the performing right, by operation of law, 17 U.S.C. Sec. 201(b), unless the hiring agreement otherwise provides. Thus it becomes important to determine whether the stations can obtain from the producer the music performing right, along with all of the other rights in a syndicated program that are conveyed to the stations when the program is licensed. As to "inside" music, source licensing would mean that the producer would either retain the performing right and convey it to the stations, instead of following the current practice of assigning it to the composer and a publishing company, or reacquire the performing right from the composer and publisher for conveyance to the stations. As to "outside" music, source licensing would mean that the producer would have to acquire from the copyright proprietor the performing right, in addition to the "synch" right now acquired.
 
 
 42
 Plaintiffs sought to prove that source licensing was not a realistic alternative by presenting two types of evidence: "offers" from stations and analysis of the market. Prior to bringing this lawsuit, the stations had not sought to obtain performing rights via source licensing.[10] Perhaps prompted by the evidentiary gap emphasized in our decision in CBS-remand or by the taunting of defendants in this litigation, plaintiffs began in mid-1980, a year and one-half after the suit was filed, to create a paper record designed to show the unavailability of source licensing.
 
 
 43
 Various techniques were used. Initially, some stations simply inserted into the standard form of licensing agreement for syndicated programs a new clause specifying that the producer has obtained music performing rights and that the station need not do so. No offer of additional compensation for the purchase of the additional rights was made. Not surprisingly most producers declined to agree to the proposed clause. A vice-president of MCA Television Limited ("MCA"), one of the major syndicators, replied to KAKE-TV, "It is surprising to me that the station would attach a Rider of such magnitude without previously discussing it with us.... [Y]ou are apparently asking us to undertake the clearance of the music performance rights in [the "Rockford Files" TV series] without offering any additional payment.... [W]e are unable to accept the amendment.... This does not mean, of course, that a different approach is unacceptable. It does, however, mean that a change of this magnitude should be discussed well in advance so that our respective concerns can be addressed."
 
 
 44
 Another approach, evidenced by King Broadcasting Co.'s letter to MCA, attached a music performing rights rider to the standard syndication licensing agreement and added, "If [sic ] an additional fee is in order, we would certainly consider favorably any such reasonable fee." Another approach, adopted by Chronicle Broadcasting Co. in letters to various syndicators, was a request for source clearance of music performing rights with the comment, "Chronicle recognizes that this contemplated change ... may [sic ] in some instances require an adjustment in the basic program license fees." Metromedia, Inc., owner of several stations, went further and asked Twentieth Century-Fox Television ("Fox"), "Since you are the 'seller', what is the price you would affix to the altered product [the syndication license including music performing rights]?" In reply Fox made the entirely valid point that since syndication licensing without music performing rights had been the industry practice for years, it was Metromedia's "responsibility to advise us in what manner you would like" to change the current arrangements.[11] Notably absent from all of the correspondence tendered by the plaintiffs is the customary indicator of a buyer's seriousness in attempting to make a purchase--an offer of a sum of money.
 
 
 45
 Judge Gagliardi properly declined to give any probative weight to the plaintiffs' transparent effort to assemble in the midst of litigation evidence that they had seriously tried to obtain source licensing. He found "plaintiffs' source licensing foray so darkened by the shadow of the approaching trial that its results may not be relied upon to support either side." 546 F.Supp. at 292. Nevertheless the District Court concluded that source licensing was not a realistic alternative because the syndicators "have no impetus to depart from their standard practices and request and pay for television performing rights merely in order to pass them along to local stations." Id. This conclusion does not follow from some of the Court's factual findings and rests on a view of the syndication market that is contradicted by other findings.
 
 
 46
 The District Court viewed the syndication market as one in which the balance of power rests with the syndicators and the stations have no power to "compel" a reluctant syndicator to change to source licensing. Id. Yet the Court found that there are eight major syndicators, id. at 280 & n. 13, and that they distribute only 52% of all syndicated programs, id. at 281, hardly typical of a non-competitive market. Moreover, the Court characterized production of syndicated programs as a "risky business," id. at 282, a finding fully supported by the evidence. It may be that the syndicator of a highly successful program has the upper hand in negotiating for the syndication of that program and would not engage in source licensing for music in that program simply to please any one station, but it does not follow that the market for the wide range of syndicated programs would be unresponsive to aggregate demand from stations willing to pay a reasonable price for source licensing of music performing rights.
 
 
 47
 The District Court recognized that, even under its view of a syndication market weighted in favor of the syndicators, source licensing could be said to be unavailable only if stations would not offer "premium prices." Id. at 292. There is no subsidiary finding as to what prices the Court thought stations would have to offer to obtain source licensing. That is not surprising in view of the failure of the plaintiffs to present evidence to show either what such prices might be or that they would be "premium" in the sense of significantly exceeding an objectively reasonable value of the rights obtained. Nor is the alleged unwillingness of the producers to undertake source licensing established by the fact that some producers own music publishing companies that receive royalties as their distributive share of the fees stations pay for the blanket license. The undisputed evidence shows that these fees are far too small to persuade syndicators to refuse to undertake source licensing in the face of reasonable offers. BMI, for example, typically distributes to a publisher between 50cents and 85cents for theme and background music in a half-hour episode of a syndicated program shown on a single station; by contrast, the syndication licensing fee can exceed $60,000 for a single episode of a popular series shown in a major television market. Though some of the major producers that own music publishing companies have received more than $1 million in annual television distributions of music royalties, those royalties are a small fraction of their syndication revenue.
 
 
 48
 Defendants vigorously assert that whatever reluctance producers may have to undertake source licensing reflects their view of the efficiency of the blanket license. They contend that the blanket license may not properly be found to be a restraint simply because producers of syndicated programs regard it as efficient. We need not determine whether defendants have correctly analyzed the motivation of those syndicators who have expressed reluctance to undertake source licensing. Our task, in determining whether plaintiffs have presented evidence sufficient to support a conclusion that the blanket license is a restraint of trade, is not to psychoanalyze the sellers but to search the record for evidence that the blanket license is functioning to restrain willing buyers and sellers from negotiating for the licensing of performing rights to individual compositions at reasonable prices. Plaintiffs have simply failed to produce such evidence.
 
 
 49
 Instead they suggest that source licensing is not a realistic alternative because the agreements producers have made with composers and publishers are a "contractual labyrinth," Brief for Appellants at 53 n. 73, and because the composers have precluded price competition among songs by "splitting" performing rights from "synch" rights, id. at 2. But plaintiffs have made no legal challenge to the "composer-for-hire" contracts by which "inside" music is customarily obtained for syndicated programs, with provisions for producers to assign performing rights to composers and publishers. And composers have not "split" performing rights from "synch" rights; they have separately licensed distinct rights that were created by Congress. Moreover, the composers' grant of a performing rights license to ASCAP/BMI is on a non-exclusive basis. That circumstance significantly distinguishes this case from Alden-Rochelle, where ASCAP's acquisition of exclusive licenses for performing rights was held to restrain unlawfully the ability of motion picture exhibitors to obtain music performing rights directly from ASCAP's members.
 
 
 50
 The Claimed Lack of Necessity. Plaintiffs earnestly advance the argument that the blanket license, as applied to syndicated programming, should be declared unlawful for the basic reason that it is unnecessary. In their view, the blanket license is suspect because, where it is used, no price competition occurs among songs when those who need performing rights decide which songs to perform. The resulting absence of price competition, plaintiffs urge, is justifiable only in some contexts such as night clubs, live and locally produced programming of television stations, and radio stations, which make more spontaneous choices of music than do television stations.
 
 
 51
 There are two fundamental flaws in this argument. First, it has not been shown on this record that the blanket license, even as applied to syndicated television programs, is not necessary. If all the plaintiffs mean is that a judicial ban on blanket licensing for syndicated television programs would not halt performance of copyrighted music on such programs and that some arrangement for the purchase of performing rights would replace the blanket license, we can readily agree. Most likely source licensing would become prevalent, just as it did in the context of motion pictures in the aftermath of Alden-Rochelle. But a licensing system may be "necessary" in the practical sense that it is far superior to other alternatives in efficiency and thereby achieves substantial saving of resources to the likely benefit of ultimate consumers, who usually end up paying whenever efficient practices are replaced with inefficient ones.
 
 
 52
 Moreover, the evidence does not establish that barring the blanket license as to syndicated programs would add any significant price competition among songs that the blanket license allegedly prevents. When syndicators today decide what music to select for their programs, they do so in the vast majority of instances, by deciding which composer to hire to compose new music for their programs. As to that "inside" music, which plaintiffs estimate accounts for 90% of music on syndicated programs, there is ample price competition: Prices paid as "up front" money in order to hire composers vary significantly. Even when syndicators consider use of pre-existing music (for which copyright protection has not expired), there is some price competition affecting the choice of that "outside" music because prices for "synch" rights vary. With this degree of price competition for music on syndicated programs already in place, it is entirely a matter of speculation whether replacement of the blanket license with source licensing would add any significant increment to price competition at the point where the syndicators decide which music to use. And since music is such a small portion of the total cost of a syndicated program to the television stations, and would still be even if performing rights were acquired at the source and included in the total price to the station, it is also a matter of speculation whether any significant increase in price competition for music would occur when television stations decide which syndicated programs to purchase in a world of source licensing. Viewed in the context of what is known about the way music is now obtained by syndicators and the entirely speculative nature of what benefits might occur if blanket licensing were prohibited, the evidence does not show that the blanket license is unnecessary to achieve its present efficiencies.
 
 
 53
 The second flaw in the argument is more fundamental. Even if the evidence showed that most of the efficiencies of the blanket license could be achieved under source licensing, it would not follow that the blanket license thereby becomes unlawful. The blanket license is not even amenable to scrutiny under section 1 unless it is a restraint of trade. The fact that it may be in some sense "unnecessary" does not make it a restraint. This is simply a recognition of the basic proposition that the antitrust laws do not permit courts to ban all practices that some economists consider undesirable.[12] Since the blanket license restrains no one from bargaining over the purchase and sale of music performance rights, it is not a restraint unless it were proven that there are no realistically available alternatives. As we have discussed, the plaintiffs did not present evidence to establish the absence of realistic alternatives. It is therefore irrelevant whether, as plaintiffs contend, the blanket license is not as useful or "necessary" in the context of syndicated programming on local television stations as it is in other contexts. Not having been proven to be a restraint, it cannot be a violation of section 1.
 
 
 54
 The blanket license has been challenged in a variety of contexts. It has been upheld for use by nightclubs and bars, BMI v. Moor-Law, Inc., 527 F.Supp. 758 (D.Del.1981), aff'd mem., 691 F.2d 490 (3d Cir.1982), by radio stations, K-91, Inc. v. Gershwin Publishing Corp., 372 F.2d 1 (9th Cir.1967), cert. denied, 389 U.S. 1045, 88 S.Ct. 761, 19 L.Ed.2d 838 (1968), and by a television network, CBS-remand, supra. Without doubting that the context in which the blanket license is challenged can have a significant bearing on the outcome, we hold that the local television stations have not presented evidence in this case permitting a conclusion that the blanket license is a restraint of trade in violation of section 1.
 
 
 55
 The judgment of the District Court is therefore reversed.
 
 WINTER, Circuit Judge, concurring:
 
 56
 I disagree with little stated in Judge Newman's thoughtful and comprehensive opinion. I write separately because I believe that it demonstrates that the blanket license as presently used cannot have an anti-competitive effect and hope that his analysis, used out of context, will not lead to future needless litigation over blanket licenses in the music industry.
 
 
 57
 In Broadcast Music, Inc. v. Columbia Broadcasting System, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), the Supreme Court remanded to us to apply rule of reason analysis to ASCAP's and BMI's blanket licenses. We concluded that the blanket licenses had no anti-competitive effect with regard to the CBS network. CBS, Inc. v. ASCAP, 620 F.2d 930 (2d Cir.1980), cert. denied, 450 U.S. 970, 101 S.Ct. 1491, 67 L.Ed.2d 621 (1981). We have now engaged in a similar analysis with regard to the broadcasters and have reached the same conclusion.
 
 
 58
 The result of this scrutiny has been to demonstrate that so long as composers or producers have no horizontal agreement among themselves to refrain from source or direct licensing and there is no other artificial barrier, such as a statute, to their use, a non-exclusive blanket license cannot restrain competition. In those circumstances, it is simply one alternative competing on the basis of price and services with others. The lack of use of the alternatives does not signal a restraint on competition but merely reflects the competitive superiority of the blanket license. So long as resort to the alternatives is not impeded by agreement among composers or producers or by some other artificial barrier, the rights and services afforded by the blanket license must be priced at a competitive level and no injury to consumers is possible.
 
 
 59
 Our scrutiny in CBS and in the instant case fully verifies the conclusion that blanket licenses reduce the costs of licensing copyrighted musical compositions. They eliminate costly, multiple negotiations of the various rights and provide an efficient means of monitoring the use of musical compositions. They also allow users of copyrighted music to avoid exposure to liability for copyright infringement. ASCAP and BMI blanket licenses almost invariably include not only the compositions to be used but also all others that might assert an infringement claim. The alternatives of source or direct licensing grant rights only to particular compositions and not to those with potential infringement claims. The limited number of notes on a scale creates a potential for a multitude of infringement actions, and avoiding exposure to such litigation and possible liability may be valuable indeed to users of musical compositions.
 
 
 60
 The point, however, is not that any particular efficiencies are available through blanket licensing but that such licenses will be purchased only if they are less costly than the next best alternative. Why else would producers, who generally own the musical copyrights used in their programs, choose to use ASCAP, which retains part of the revenues collected? The point is best made by comparing these blanket licenses with the arrangement struck down in NCAA v. Board of Regents of the University of Oklahoma, --- U.S. ----, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). In that case, the NCAA attempted to sell exclusive television rights to football games between member colleges. The member institutions had agreed among themselves to abide by the rules of the NCAA and to boycott collectively any institution that violated those rules. I think all would agree that, if the NCAA merely offered a non-exclusive license to all football games between member schools and the member schools were free to negotiate television rights on their own, the action would have been dismissed on the pleadings. Indeed, the NCAA license would obviously enhance rather than restrict the competitive alternatives. In my view, the non-exclusive blanket licenses at issue here are indistinguishable from that hypothetical.
 
 
 61
 With these additional observations, I concur in Judge Newman's opinion.
 
 
 
 *
 After oral argument, Judge Cardamone recused himself and was replaced by Judge Pratt, who has had the benefit of a transcript of the oral argument
 
 
 [1]
 A non-dramatic performing right is the right to perform a musical composition other than in a dramatic performance, which the ASCAP blanket license defines as "a performance of a musical composition on a television program in which there is a definite plot depicted by action and where the performance of the musical composition is woven into and carries forward the plot and its accompanying action." See 3 Nimmer on Copyright Sec. 10.10[E] (1984)
 
 
 [2]
 The stipulation defines "syndicated program" as "a theatrical motion picture, pre-recorded television program or live television program which is offered for sale or license to a television station to be broadcast by that station as a non-network program."
 
 
 [3]
 The assignment of performing rights from the producer to the composer and publishing company is typically not an assignment of all performing rights, but the exceptions are not pertinent to this litigation
 
 
 [4]
 United States v. ASCAP, 1940-43 Trade Cas. (CCH) p 56,104 (S.D.N.Y.1941); United States v. BMI, 1940-43 Trade Cas. (CCH) p 56,098 (S.D.N.Y.1941)
 
 
 [5]
 United States v. ASCAP, 1950-51 Trade Cas. (CCH) p 62,595 (S.D.N.Y.1950). The BMI consent decree was amended in 1966, United States v. BMI, 1966 Trade Cas. (CCH) p 71,941 (S.D.N.Y.1966)
 
 
 [6]
 See also Arizona v. Maricopa County Medical Society, 457 U.S. 332, 355, 102 S.Ct. 2466, 2479, 73 L.Ed.2d 48 (1982) ("the blanket license arrangement [in CBS ] did not place any restraint on the right of any individual copyright owner to sell his own compositions separately to any buyer at any price") (footnote omitted)
 
 
 [7]
 The program license is not an alternative means of obtaining performing rights to individual compositions since it permits the licensee to use all compositions in the repertory of the licensor for an individual program. Its use would not afford a station a choice among competitive prices of performing rights for individual compositions. Nevertheless, to whatever extent it is available, it is an alternative means of obtaining performing rights needed to broadcast one program. Moreover, the program license, if available, may facilitate the stations' efforts to pursue direct licensing and source licensing, as we discuss later in the text. In any event, the parties joined issue as to whether it is a realistically available alternative, the District Court ruled on the issue, and we review that ruling
 
 
 [8]
 Though the record contains no evidence that the price stations are asked to pay for a program license is higher than the value of the rights received, there is no doubt that plaintiffs have confidence that such value is determinable. For example, in complaining that the blanket license is too expensive, plaintiffs cite the fact that license fees paid by station KWTX to ASCAP and BMI for all of its music equal 80% of the station's cost for its syndicated programs and allege that this percentage makes "manifest" the "lack of proportion" between paying for performing rights based on station revenue and "the actual value of the music" (emphasis added). Brief for Appellees at 55-56 n. 77
 
 
 [9]
 The owner of KWTX in Waco, Texas, testified that he could obtain music for nearly all his locally produced programs for $118 a month
 
 
 [10]
 The stations showed no interest in source licensing even during the period from 1950 to 1972 when the "carve-out" provision of the blanket license issued by BMI permitted a station to deduct from the revenue base of the blanket fee the revenue from programs for which music performing rights were cleared at the source, whether or not clearance was accomplished by licensing from BMI
 
 
 [11]
 Defendants take special delight in recounting the plaintiffs' evidence of an "offer" for source licensing made by Metromedia, Inc., owner of seven television stations. A lawyer representing Metromedia sent a request to a lawyer for Metromedia's production subsidiary, Metromedia Producers Corp. ("MPC"). The MPC attorney, after consultation with counsel for the plaintiffs, drafted a carefully worded rejection. The correspondence of this alleged "negotiation" was filed only in Metromedia's legal department, in a special file created for this litigation
 
 
 [12]
 The trial record reveals a sharp disagreement between respected economists as to whether the blanket licensing of music performing rights is economically beneficial or harmful. For a forceful argument that the blanket license is economically sound, see Sobel, The Music Business and the Sherman Act: An Analysis of the "Economic Realities" of Blanket Licensing, 3 Loy.L.A.Ent.L.J. 1 (1983)